Jake Krantz, Sophie Krantz (Husband and Wife) v. Commissioner.
Krantz v. Commissioner
Docket No. 36371.
United States Tax Court
T.C. Memo 1956-231; 1956 Tax Ct. Memo LEXIS 63; 15 T.C.M. (CCH) 1205; T.C.M. (RIA) 56231; October 17, 1956
*63 1. For the years 1939 to 1944, inclusive, the respondent determined deficiencies in income taxes and additions thereto for fraud against the husband and wife jointly and severally. The wife, who could not read or write English, disclaimed liability on the grounds that she did not join in the execution or preparation of the returns, had no knowledge of their content, and did not intend to file a joint return. Held, that the wife is not liable since joint returns were not intended or filed, notwithstanding the fact that some of the income returned might have been that of the wife. 2. Negligence: Statute of limitations. - The respondent computed the petitioner's taxable income for the years 1939 to 1945, inclusive, by the net worth and expenditures method and determined deficiencies and additions thereto for fraud. The petitioner contended: (1) that the use of the net worth method was improper since his only source of income was a hardware business and the books and records of that business clearly reflected his income; (2) that the net worth computation was incorrect since it failed to account for opening cash on hand and erroneously included assets belonging to others; (3) that *64 the deficiency, if any, was not due to fraud; and (4) that the statute of limitations bars the assessments for the years 1939 to 1942, inclusive. Held: (1) that errors and irregularities in the books justified use of the net worth method, and (2) that petitioners have not proved that Jake Krantz had any cash on hand at the beginning of the net worth period other than the amount which the Commissioner has allowed in his computation. It is also held that some of the United States savings bonds in the names of others were purchased with funds supplied by Jake and were erroneously treated by the Commissioner in his net worth computation as assets belonging to Jake, nevertheless, the money furnished by Jake to purchase these bonds represented gifts made by Jake in the taxable years and should be treated as nondeductible expenditures in the net worth computation. Held, further: (3) that there was no fraud except for the years 1942, 1943, and 1944, and a part of the deficiency for each of those years is due to fraud with intent to evade tax, and (4) that the statute of limitations bars the assessments for the years 1939 to 1941, inclusive. Hugh R. Dowling, Esq., 1025 Barnett Bank Building, Jacksonville, Fla., for the petitioners. Hugh G. Isley, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent has determined deficiencies in income taxes and additions thereto as follows: Additions to
Additions to
Tax Section
Tax Section
Year
Deficiency
291(a)
293(b)
Total
1939
$ 9.52
$ 4.76
$ 14.28
1940
113.04
56.52
169.56
1941
44.83
22.42
67.25
1942
5,761.45
2,880.73
8,642.18
1943
9,501.94
4,750.97
14,252.91
1944
18,008.79
9,004.40
27,013.19
1945
948.11
$267.05
474.05
1,689.22
Total
$34,387.68
$267.05
$17,193.86
$51,848.59
*66 A deficiency in income tax for the year 1946 is not contested. The respondent has determined that the petitioners (husband and wife) are jointly and severally liable for all of the years involved, and has computed their income on the net worth and expenditure method. The petitioner Sophie Krantz denies liability for the years 1939 through 1944 on the ground that joint returns were not filed for those years. The petitioners contend that (1) the use of the net worth and expenditure method was improper, (2) the net worth computation was incorrect, (3) the penalties were erroneously added, and (4) the statute of limitations bars assessments for the years 1939 to 1942. Findings of Fact A stipulation of facts has been filed and is incorporated herein by reference. The petitioners, Jake and Sophie Krantz, husband and wife (hereinafter referred to as Jake and Sophie) resided in Birmingham, Alabama, from 1922 until July 15, 1946, and thereafter in Miami, Florida. Income tax returns for the years 1939 to 1944, inclusive, were filed in the name of Jake with the then collector of internal revenue for the district of Alabama. An income tax return for the year 1945 was filed in the names *67 of Jake and Sophie with the then collector of internal revenue for the district of Florida on March 15, 1947, one year after the correct filing date. The returns for the years 1939 to 1942, inclusive, were filed more than 3 years prior to the assessment of the deficiencies and additions in question here. The petitioners were married in 1909 and lived together as husband and wife until January 4, 1954, when Jake died intestate. They had four children, Abraham P., Mollie Krantz Schulman, Isadore H. and Bertha Krantz Luks, born in 1910, 1915, 1918, and 1920, respectively. In the County Judge's Court of Dade County, Florida, in Probate No. 32649-B, in re Estate of Jacob Krantz, Deceased, the following order was entered on April 19, 1954: "ORDER OF ADMINISTRATION UNNECESSARY "THIS CAUSE having come on for hearing upon the sworn petition of Sophie Krantz, Isadore H. Krantz, Mollie M. Schulman, Al Krantz and Bertha Luks, and the Court being fully satisfied that the estate of the above-named decedent is entitled to the special benefits of Chap. 22847 Laws of Florida, Acts of 1945, as amended by Chap. 23716 Laws of Florida, Acts of 1947, and Chap. 25010, Laws of Florida, Acts of 1949; *68 that the averments of said petition are true, and that there has been no concealment of material facts, and the Court being fully advised in the premises, finds: * * *
"7. That no necessity for administration of the estate of the said Jacob Krantz, deceased, exists. "It is, thereupon, upon consideration thereof - ORDERED, ADJUDGED and DECREED by the Court that said petition be, and the same is hereby granted, and that administration of the estate of said decedent is unnecessary, and that Sophie Krantz, as the surviving spouse of the said decedent, is entitled to a distribution of the entire estate without administration." Jake operated a hardware store known as Star Hardware Co. (hereinafter referred to as Hardware) from the late 1920's or early 1930's until about June 30, 1944. On the latter date he sold Hardware to his son-in-law, Edward Schulman, for $5,000 in cash and a promissory note for $12,500. Subsequent to the sale of Hardware in June 1944 and prior to the end of 1944, Jake opened a business under the trade name of K & L Jobbing Company (hereinafter referred to as Jobbing). Jobbing was liquidated during 1945. Joint Returns Sophie could neither read nor *69 write English, except for her own name. Some money which she had saved prior to marriage was used in the hardware business. She used to help her husband in the store, working at the cash register and making sales. She had no independent income of her own and any money that she received came from Jake. A ledger account on Hardware's books for the years 1943 and 1944 carried the caption "Jake Krantz & Wife - Per." An account on the trial balance dated December 30, 1949, had the caption "Sophie Krantz - Capital." Sophie did not participate in the preparation or execution of the returns filed in the name of Jake for the years 1939 to 1944, inclusive, and did not have any knowledge of their contents. She signed the return for the year 1945 that was filed in the names of Jake and Sophie. Jake claimed an exemption for Sophie on the returns for the years 1939 to 1944, and Sophie did not file an individual return for any of those years. Sophie did not intend to execute joint returns for the years 1939 to 1944. The returns for those years were not joint returns. The 1945 return was a joint return. The deficiency notice was addressed to "Jake Krantz, Sophie Krantz (Husband and Wife)" and *70 reads, in part, as follows: "You are advised that the determination of your income tax liability for the taxable years ended December 31, 1939 to December 31, 1946, inclusive, discloses a deficiency of $34,406.36, together with penalties of $17,460.91, as shown in the statement attached." Income - Deficiency - Fraud Jake had little or no knowledge of bookkeeping or accounting. The books and accounting records of Hardware were kept by or under the supervision of an experienced public accountant from about the time that Jake started the business until its sale in 1944, from data furnished by Jake. Jake kept a cash book in which he entered the cash sales and cash payments for each day. The accountant would take this book, along with the monthly bank statement and canceled checks, back to his office where he kept a journal and ledger. The sales and cash payments were entered in the journal from the cash book. The deposits and check payments were entered in the journal from the bank statement. The items were then posted from the journal to the ledger accounts. Prior to the years in question the accountant discovered that the deposits in the bank exceeded the amount of cash sales *71 that Jake had recorded in his cash book. Upon investigation, Jake told him that he was exchanging checks with third persons. Jake would give his postdated check in exchange for the presently dated check of the party. Jake would deposit the check that he received immediately in order to secure needed working capital. Upon this information the accountant opened an exchange check account in the ledger. He would credit the account with part of the excess of deposits over the sales that Jake had entered in the cash book and debit the account with checks that Jake told him were exchange checks. This account remained in existence throughout the years involved and substantial amounts passed through it. The accountant, around 1936 or 1937, also believed that part of the discrepancy between sales and deposits might have resulted from an unrecorded payment on charge sales. When a customer would buy on credit Jake would place the name of the customer and the amount on a card in the cash register. When the amount was paid Jake was supposed to ring it up on the register as a cash sale. The accountant saw Jake fail to record a payment one day, so he notified Jake that he was going to enter part *72 of the excess of deposits over the sales recorded in the cash book as a sale. The accountant continued this practice throughout the years in question. The accountant would make a monthly analysis of the sales, exchange checks, deposits, and cash payments in order to find discrepancies and assure himself that the various items were being recorded properly. At the end of the year, Jake would take a physical inventory and would tell the accountant its value. The accountant did not see these inventories but took Jake's word for them. The accountant would make his year-end adjusting and closing entries and make a trial balance of the ledger accounts. From this trial balance he would make up the income tax returns. The tax returns substantially agreed with the books as kept from information furnished by Jake. The gross profit percentage of Hardware as shown on the books ranged from 27.18 per cent to 33.85 per cent for the years 1936 to 1943. Much of the detailed work in recording the transactions was performed by persons who worked for the accountant in his office. If they were not sure about an item they would call Jake for clarification. The accountant never saw the deposit slips and *73 could not verify whether a deposit constituted an exchange. He never performed an audit to verify the accuracy of information submitted by Jake. At least several errors and unexplained items of substantial import were in the books. The cash account was seldom correct and had substantial credit balances at various times. On December 31, 1943, the ending inventory on the trial balance was $30,298.28 but on the operating statement and tax return it was 15 per cent less, or $24,753.54. Also in 1943, the purchases on the trial balance were about $4,100 less than shown on the operating statement and on the return. No explanation for these discrepancies appeared in the record. The exchange check account, supposedly a balance sheet account, was treated as a nominal account and the debit balance therein was written off to profit and loss. An adjustment for that item was made in a subsequent year. A check cashed in September 1943 for $2,500, made payable to cash and used to purchase United States savings bonds, was charged to merchandise purchases. Another check for $2,500 cashed in October 1943, and used to pay for a personal obligation was also charged to purchases. The false entries were *74 reflected in the tax return for 1943. In January 1944, a check for $2,000 to pay an O.P.A. fine was charged to the account. The accountant never knew of this O.P.A. fine. Under the system used the information relative to these transactions should have been given to the accountant or his employees by Jake. On December 31, 1942, substantial credit balances in the cash account and the loan account were removed by debits to those accounts and a credit to "Jake Krantz - Personal." No explanation followed the journal entry. An employee of Jobbing kept the books of that business and the accountant made out the tax returns on the basis of the information in those books. Those books also had an exchange check account. The method of accounting employed by the petitioner and his books and records did not clearly reflect his income. The net worth statement, which is the basis of the income determined by the respondent, and the income reported by the petitioner is set out in the schedule below: 12-31-38
12-31-39
12-31-40
12-31-41
ASSETS:
1.
2.
$ 186.64
$ 302.25
$ 861.10
$ 131.77
3.
140.31
779.65
1,383.19
2,471.83
4.
5.
6.
9,772.04
10,546.62
13,952.94
14,712.86
7.
8.
8.
9.
10.
6,100.00
6,100.00
6,100.00
6,100.00
Total
assets
$16,198.99
$17,728.52
$22,297.23
$23,416.46
11.
12.
$16,198.99
$17,728.52
$22,297.23
$23,416.46
Less net worth
prior year
16,198.99
17,728.52
22,297.23
Inc. or dec. in net
worth during year
$ 1,529.53
$ 4,568.71
$ 1,119.23
Add: 13.
14.
63.25
15.
1,557.40
1,631.12
3,453.83
16.
$ 3,086.93
$ 6,199.83
$ 4,636.31
17.
$ 2,181.98
$ 3,783.94
$ 4,291.75
18.
$ 904.95
$ 2,415.89
$ 344.56
*75 12-31-42
12-31-43
12-31-44
12-31-45
ASSETS:
1.
$ 101.54
2.
$ 696.08
$ 3.16
20.35
$ 20.35
3.
327.62
423.78
Closed
4.
15,732.79
5.
9,000.00
6.
23,523.96
25,924.38
7.
10,510.75
30,228.25
54,240.75
55,353.25
8.
19,098.88
8.
11,500.00
9.
19,098.88
10.
6,100.00
6,100.00
6,100.00
6,100.00
Total
assets
$41,158.41
$62,679.57
$91,051.52
$86,206.39
11.
12.
$41,158.41
$62,679.57
$91,061.52
$86,206.39
Less net worth
prior year
23,416.46
41,158.41
62,679.57
91,061.52
Inc. or dec. in net
worth during year
$17,741.95
$21,521.16
$28,381.95
($ 4,855.13)
Add: 13.
2,000.00
5,000.00
14.
280.75
1,394.41
1,044.17
1,034.56
15.
3,269.92
3,228.03
3,500.00
4,000.00
16.
$21,292.62
$26,143.60
$34,926.12
$ 5,179.43
17.
$ 7,495.08
$ 5,863.65
($ 6,563.29)
$ 1,456.90
18.
$13,797.54
$20,279.95
$41,489.41
$ 3,722.53
Item No. 1. A checking account in the name of Jacob Krantz opened on July 1, 1944, and closed on May 22, 1945. The balances shown are correct. Item No. 2. A savings account opened by Sophie on September 27, 1937 in the name of A.B. (Abraham), the eldest *76 son who was serving in the army during the years in question, or Sophie Krantz. Both had the authority to withdraw funds. Most of the withdrawals during the period in question were made by Sophie. A part of the money deposited in this account belonged to Abraham. The balances shown are correct. The money deposited by Sophie in this account was furnished by Jake. Item No. 3. A savings account in the name of Sophie Krantz opened on October 8, 1938, and closed on January 24, 1944. The balances shown are correct. The money deposited in this account was furnished by Jake. Item No. 4. A checking account in the name of Sophie Krantz opened on May 22, 1945. The balance in the account on December 31, 1945, was $732.79. On January 2, 1946, $15,000 was deposited therein. The balance on January 2, 1946, was $15,732.79. The petitioner Jake had the $15,000 that was deposited on January 2, 1946 on hand on December 31, 1945; 1945 was the year when a joint return was filed. Item No. 5. Cash on hand that Sophie had as the result of the sale of a 6-unit apartment building for $15,000. It was purchased on May 29, 1945, for $14,700, and $766.50 in expenses was incurred prior to sale. The transaction *77 was properly reflected on the 1945 income tax return. Item No. 6. The agreed net worth of Hardware. Item No. 7. United States savings bonds purchased during the period in question. These bonds and the respective years of their purchase are shown by Joint Exhibit No. 14-N, which is headed "Jacob and Sophie Krantz, Summary of U.S. Savings Bonds Purchased, Years 1942-1945." The following is a description of said bonds as given in the exhibit: Cost Values
Purchases
Purchases
Purchases
Purchases
Bought in name of:
Series
Year 1942
Year 1943
Year 1944
Year 1945
Sophie Krantz or
E
$ 2,250.00
Bertha Rener
Sophie Krantz or
E
281.25
$ 1,125.00
Bertha Krantz
Sophie Krantz or
E
656.25
750.00
Isadore H. Krantz
Sophie Krantz or
E
206.25
$ 37.50
Lawrence Z. Krantz
Sophie Krantz or
E
150.00
750.00
Roslyn J. Schulman
Sophie Krantz or Jake
E
37.50
Krantz
Sophie Krantz or
E
450.00
1,125.00
$ 37.50
Bertha K. Luks
Sophie Krantz or
E
5,175.00
2,662.50
75.00
Jacob Krantz
Sophie Krantz or
E
750.00
Lucille Krantz
Sophie Krantz or
E
750.00
Martin D. Schulman
Sophie Krantz or
E
750.00
Larry Z. Krantz
Sophie Krantz or
G
5,000.00
Jacob Krantz
Sophie Krantz
E
18.75
Sophie Krantz
F
37.00
Jacob Krantz or
E
3,581.25
2,550.00
5,400.00
Sophie Krantz
Jacob Krantz or
F
3,330.00
Sophie Krantz
Jacob Krantz or
G
5,500.00
300.00
1,000.00
Sophie Krantz
lJacob
Krantz or
Abraham
Krantz
E
3,075.00
Jake Krantz or Sophie
G
1,000.00
Krantz
Jake Krantz or Abe
E
1,050.00
Krantz
Roselyn J. Schulman
E
75.00
or Sophie Krantz
Abe Krantz or Jake
E
975.00
Krantz
Abraham Krantz or
E
1,500.00
37.50
Sophie Krantz
Isadore H. Krantz or
E
1,050.00
750.00
Sophie Krantz
Lawrence Z. Krantz or
E
131.25
Sophie Krantz
Bertha K. Luks or
E
186.25
375.00
Sophie Krantz
Bertha Rener or
E
375.00
Sophie Krantz
Martin D. Schulman or
E
37.50
Sophie Krantz
Purchases by years
$10,510.75
$19,717.50
$24,012.50
$ 1,112.50
10,510.75
Cumulative
$30,228.25
30,228.25
Cumulative
$54,240.75
54,240.75
$55,353.25
*78 All of the persons listed above other than Jake and Sophie are related to Jake and Sophie. Jake furnished the purchase price for the bonds that were purchased and are listed above. Item No. 8. The balance due on the $12,500 note of Edward Schulman for the purchase of Hardware. Item No. 9. The agreed net worth of Jobbing. Item No. 10. The personal residence of petitioners, which was in the name of Sophie. Item No. 11. Petitioner had no liabilities. Item No. 12. The net worth computation. Item No. 13. Two fines paid by Jake for violating the O.P.A. regulations. Item No. 14. Income tax payments. Item No. 15. The agreed living expenses. Item No. 16. Taxable income as determined by the respondent. Item No. 17. Income returned. Item No. 18. Understatement of income as determined by the respondent. Jake began acquiring real estate around 1922, and in 1929 he owned real estate assessed at $29,114 (assessed at 60 per cent of reasonable market value). This does not reflect any encumbrances that might have been on the property. During the latter part of 1938, Jake was adjudged a bankrupt in Birmingham, Alabama. Immediately after his discharge from bankruptcy *79 Jake's only assets were his home, which was in the name of Sophie, and Star Hardware Co. If he had any cash the amount was small and is not shown by the record. The assets shown by respondent's net worth statement, which was introduced in evidence as Joint Exhibit No. 8-H, are correct except as hereinafter noted. There was introduced in evidence as Joint Exhibit No. 13-M a schedule entitled "Bond Purchases - Re Jacob and Sophie Krantz." This schedule shows United States savings bonds purchased during the year 1942, 1943, 1944, and 1945. The total of bonds purchased in those years as shown by the schedule was $55,823.25. Of this amount it is stipulated that "In his determination, the respondent eliminated the bonds appearing on Exhibit 13-M and marked with an asterisk, on the ground that said bonds were purchased by Abraham Krantz." The bonds purchased by Abraham Krantz." The bonds purchased by Abraham Krantz which were purchased with his own funds and eliminated by the Commissioner are not in controversy here. There was introduced in evidence as Joint Exhibit No. 14-N a schedule entitled "Jacob and Sophie Krantz, Summary of U.S. Savings Bonds Purchased, Years 1942-1945." This schedule *80 has been incorporated in our Findings of Fact. It was used by the Commissioner in his computation of income on the net worth method. The bonds described therein were purchased with funds supplied by Jake. The petitioner understated his income for all of the years involved and part of the deficiencies for the years 1942, 1943, and 1944 was due to fraud with intent to evade the tax. No part of the deficiencies determined by the Commissioner for the years 1939, 1940, 1941, and 1945 was due to fraud with intent to evade tax. Opinion BLACK, Judge: A preliminary question of jurisdiction is present since Jake Krantz died subsequent to the filing of the petition and prior to the hearing. Neither party raises this question in his brief, but at the hearing an exhibit was introduced in evidence which shows that the Probate Court of Florida has entered an order that no administration of Jake's estate is necessary. There is no executor or administrator of his estate since his estate was disposed of under the Order of Administration Unnecessary Law of Florida. There has been no substitution of parties but we hold that the jurisdiction which attached upon the filing of the petition is not *81 divested despite the failure to make a substitution under Rule 23. See Roy R. Yeoman, 25 T.C. 589 (1955). Joint Returns The respondent has determined deficiencies against Jake and Sophie, jointly and severally, for all of the years involved. The 1945 return is admittedly a joint return. The returns for the years 1939 to 1944, inclusive, were filed in the name of Jake, individual, and Sophie contends that she is not liable for those years. There is joint liability only when a joint return is filed. Eva M. Manton, 11 T.C. 831, 836 (1948). Whether a return is joint depends upon the intent of the parties. The intent must be gleaned from the facts and the facts here clearly indicate that no joint returns were intended. Sophie could not read or write English except for her name. She took no part in preparing or executing the returns and had no knowledge of their contents. They were not designated as joint returns and she did not sign them. Sophie had no independent income of her own; any money which she received was from her husband. The fact that she might have invested some of her premarital savings in the business and worked in the hardware store does *82 not necessarily indicate that she was entitled to a share of the profits of the business. Even if she did have income which was included in Jake's return, that would not be sufficient in itself to show that a joint return was intended. McCord v. Granger, (C.A. 3, 1952) 201 Fed. 2d 103; Myrtle O. Calhoun, 23 T.C. 4 (1954). We, therefore, hold that the petitioner Sophie Krantz is not liable for any deficiencies in income tax or additions thereto for the years 1939 to 1944, inclusive. Of course, this does not absolve her from any liability which may attach as distributee of the estate of Jake Krantz. That is a matter which we do not have before us. Income and Deficiencies The respondent computed the petitioners' taxable income by the net worth and expenditures method, section 41, I.R.C. of 1939. Jake contends (1) that his only source of income was Hardware and Jobbing and that the books and records of those businesses were adequate and clearly reflected his income, therefore, resort to the net worth method is precluded by section 41, and (2) that assuming the propriety of the use of the net worth method, the computation was inaccurate. The first contention *83 of the petitioner is untenable. The unexplained entries and the false entries impeach the integrity of the accounting records of Hardware. The respondent is not required to audit those records in an attempt to correct the errors therein. He may disregard the books because they do not clearly reflect the taxpayer's income. Even if there were no apparent errors in the accounting records the unexplained excess of net worth increase over the reported income is strong indication that superficially adequate books are unreliable. Morris Lipsitz, 21 T.C. 917, 931 (1954), affd. (C.A. 4, 1955) 220 Fed. 2d 871, certiorari denied 350 U.S. 845; Holland v. United States, 348 U.S. 121. The petitioner's second contention is based on a challenge of the correctness of the net worth computation. Most of the amounts included therein are agreed upon. A review of the record in general, and the petition in particular, reveals that the petitioners contest respondent's net worth computation in three respects: (1) cash on hand at the beginning period, (2) the determination of the increase in their United States savings bonds investment through the years *84 1942, 1943, 1944, and 1945, and (3) the balance in the Exchange Bank checking account as of December 31, 1945. Petitioner contends that he had cash on hand on December 31, 1938, that was not reflected in the net worth computation. The importance of the correctness of the opening balances is evident since the computation of income by the net worth method requires a comparison between the opening and closing net worth. Holland v. United States, supra.The evidence on this point is almost nonexistent. The petitioner showed that he owned a sizable amount of real estate between 1922 and 1930. Petitioners' daughter testified that she thought that her parents kept some money in the basement of their home. In a statement to a revenue agent, Sophie testified that she and Jake had only about $100 in cash when Jake was adjudicated a bankrupt in the latter part of 1938. From this meager evidence we are unable to find that the petitioners had additional cash on hand on December 31, 1938. No specific amount has been alleged or proved. Furthermore, the facts do not warrant the application of the Cohan rule because they do not show that there was additional cash on hand in any amount. *85 Petitioner contends that the Commissioner erred in including in his net worth computation, which was introduced in evidence as Joint Exhibit No. 8-H and which we have copied in our Findings of Fact, as assets of Jake, United States savings bonds which were purchased in the name of Sophie and in the names of some of Jake's children and grandchildren. We agree with petitioners that these particular bonds should not be included as a part of Jake's assets at the end of the respective taxable years. When Jake furnished the money to purchase these bonds and they were purchased by Sophie in her name and in the children's and grandchildren's names, they were no longer Jake's property and should not be included as a part of his assets. But, so far as we can see, this will not change the computation of Jake's net income in the respective taxable years. It seems clear that Jake furnished the money with which to purchase all of these bonds included in Joint Exhibit No. 14-N. There was introduced in evidence as an exhibit by petitioners the following: "Testimony of Mrs. Sophie Krantz, taken in the office of the Intelligence Unit, Bureau of Internal Revenue, * * * Miami, Florida, * * * on *86 May 27, 1948, in the matter of the income tax liability of Jake Krantz to the United States for the years 1939 to 1944, inclusive, and of their joint liability for the years 1945 and 1946." In this testimony, among other things, Sophie testified as follows: "Q. Mrs. Krantz, we find that during 1942, 1943 and 1944 large amounts of Government bonds were bought in your name, some together with your children, some with your husband. Where did you get the money that was used to buy those bonds? "A. He (Krantz) gave it to me and told me to go down and get it. He just put out the slip and I would go over there and hand it to the girl and she would make it out. "Q. Since 1939 except that you received money from your husband, did you receive money from anybody else? "A. I couldn't receive any money from anybody else." There is no testimony to the contrary of the above. Sophie was present at the hearing in this case but she did not testify. Therefore, it seems to be well established by the record that these United States bonds which respondent has included in his net worth computation were all purchased with Jake's money. While it is perfectly true that when Jake gave Sophie the *87 money and she used some of it to purchase bonds in her own name and in the names of the children and grandchildren, the bonds were no longer the property of Jake and should not be included as a part of his assets, nevertheless, so much of Jake's money as was used in the purchase of these bonds represented a nondeductible expenditure, as much so as "living expenses" and should be added to his income in the same manner as the agreed living expenses have been added. When a taxpayer uses a part of his income to make a gift, which, of course, he may do, the amount of the gift is in no sense deductible even though the taxpayer is out of pocket that much money. To illustrate what we mean let us take the year 1942, which is the first year of the purchase of United States savings bonds. In that year United States savings bonds were purchased in the amount of $10,510.75. All of them have been included in respondent's net worth statement on the basis that the return was a joint return. That was error. The return, as we have held, was not a joint return. The amount of United States savings bonds which Jake purchased in his own name in 1942 was $6,911.25. That amount should be included in his *88 assets at the end of 1942. The remainder of the $10,510.75 was purchased in the name of Sophie. These bonds did not belong to Jake at the end of 1942, or in the ensuing years and, therefore, should not be included as a part of his assets. However, these expenditures for bonds for Sophie represented nondeductible expenditures and should be added to the "increase or decrease in net worth during year" just as the living expenses have been added. In a recomputation under Rule 50, this same treatment should be given to the years 1943 and 1944 as to the bonds purchased in the names of Sophie or the children and grandchildren. It should not be given to the year 1945, for that was the year of a joint return and should be treated as such. Another question is whether Item No. 4 should be shown as $732.79 or $15,732.79. The respondent treated the $15,000 deposit of January 2, 1946, as being in the account on December 31, 1945. The question is not whether the balance in the bank account on December 31, 1945, was one amount or the other, but whether the $15,000 was a part of the petitioners' net worth on December 31, 1945. The respondent has determined that it was on hand and that determination *89 is presumptively correct. The petitioners have shown that it was not in the bank on December 31, 1945, but they have not shown that it was not on hand at that date. They have not shown from where it might have come. Furthermore, if it were deleted from the December 31, 1945 net worth, the petitioners would have a net loss for the year of around $10,000, whereas they reported income in the amount of $1,456.90. The respondent's determination is sustained. Additions to the Tax The respondent's determination of a deficiency is presumptively correct. Unless the petitioner offers proof to the contrary the determination stands as correct. But the burden of proving fraud is on the respondent, section 1112, I.R.C. of 1939, and it must be proved by "clear and convincing" evidence. Frank A. Maddas, 40 B.T.A. 572 (1939), affd. (C.A. 3) 114 Fed. 2d 548. Except for the years 1942, 1943, and 1944, that "clear and convincing" evidence, we think, is lacking. For 1939, 1940, 1941, and 1945, it is true there were some understatements of income measured by the use of the net worth method used by the Commissioner and which, for reasons stated, we have sustained. The amounts *90 of such understatements of income as compared with those for 1942, 1943, and 1944 were not large. We are not convinced that these understatements of income for 1939, 1940, 1941, and 1945 were knowingly made. Hence, we hold that there was no fraud for those years. The evidence with regard to 1942, 1943, and 1944 is much stronger than for the other years. For 1942, the largest item of assets which went into the computation of the increase in Jake's net worth was the purchase of United States savings bonds in the amount of $10,510.75. Our Findings of Fact show that these bonds were purchased with Jake's money. No satisfactory explanation is given as to why these bond purchases should not be given effect in a computation of the increase in Jake's net worth for 1942. Respondent's net worth computation for 1942 shows an increase in Jake's net income for that year of $13,797.54 over the amount reported on his return. This is too large an increase for us to believe that it resulted from bookkeeping errors and things of that sort, as petitioner would have us believe. This same situation as to United States savings bonds purchased with Jake's funds exists also as to the years 1943 and 1944. *91 Also as to 1943 and 1944, respondent has strengthened his proof of fraud as to those years by certain facts which we shall now enumerate. Respondent has shown that the cost of goods sold was substantially overstated and that the overstatement was reflected on the income tax return for 1943. One check for $2,500 was made out to cash and used to purchase United States savings bonds. It was charged to the purchases account. Another $2,500 check for a personal expense was handled in the same manner. It is incredible to think that the accountant did not inquire of Jake as to the nature of these transactions. The only reasonable inference is that Jake told the accountant or his employee that they were used to purchase goods. In 1944, a check for $2,000 used to pay an O.P.A. fine was charged to the exchange check account. The effect of that entry was to distort Jake's gross income for 1944 to the extent of $2,000 by making it that much less than it otherwise would have been. The accountant never knew of the O.P.A. fine and testified that Jake probably withheld the information because he knew where the accountant stood on violations of the law. In the other years we do not have evidence *92 of this type. The respondent has not offered sufficient proof from which we can infer fraud for all years. From the evidence we do not find fraud with regard to the years 1939 to 1941, inclusive, and for 1945 with regard to the years 1942, 1943, and 1944, we find that part of the deficiency is due to fraud with intent to evade the tax and that the 50 per cent addition to tax as provided in section 293(b), I.R.C. of 1939, for those years is proper. It was agreed that the 1945 income tax return was filed on March 15, 1947, one year after the correct filing date. The petitioners have not shown reasonable cause for the delay or that it was not due to willful neglect. The 25 per cent addition to the tax for a delinquent return, as provided in section 291(a), I.R.C. of 1939, is therefore upheld. Statute of Limitations Since there was no fraud for the years 1939 to 1941, inclusive, the statute of limitations bars the assessment of the deficiency for those years. We having held that part of the deficiency for 1942 is due to fraud with intent to evade tax, the deficiency for that year is not barred by the statute of limitations. Section 276(a), I.R.C. of 1939. The petitioners make no *93 contention that the statute of limitations bars the deficiencies for the years 1943, 1944, and 1945. Decision will be entered under Rule 50.